CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
May 07, 2025
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
        DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

| | |
|---|---|
| Antonio M. Allen, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No. 3:24-cv-00067 |
| | ) |
| Officer Walker *et al.*, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

This matter is before the court on four motions to dismiss filed by six of the seven defendants in this case: Defendant Lieutenant Robert Blagriff (Dkt. 21), Defendants Captain Brian Bachert and Colonel Frank E. Dyer, III (Dkt. 27), Defendant Deputy Colonel Brian Huffman (Dkt. 46), and Defendants Officer G. Gray and Officer Walker (Dkt. 48).[1]  For the reasons that follow, the court will grant the motions to dismiss Count I with respect to all Defendants except for Huffman.  Additionally, the court will grant the motions to dismiss Count II with respect to all Defendants except for Walker and Blagriff.

## I.    Background

Facts alleged in the complaint are accepted as true for the purpose of resolving the motions.  *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).  On May 17, 2023, the U.S. Marshal Service transported Plaintiff Antonio M. Allen to Central Virginia Regional Jail ("CVRJ") in Orange County, Virginia, for booking as a pretrial detainee.  (Compl. ¶¶ 4–5,

---

[1] Allen names a seventh defendant, Officer John Doe, in his complaint.  However, as discussed below, Doe was never served.

13 (Dkt. 1).)  At the time, Allen was a defendant in a criminal case pending in the Western District of Virginia.  (*Id.* ¶ 14.)  Neamyera A. Davis was named as a co-defendant in Allen's case and was subsequently booked into CVRJ on June 30, 2023.  (*Id.* ¶ 15.)

CVRJ policies and procedures require that "Keep Separate" orders be put in place and followed for all inmates who are co-defendants in criminal cases.  (*Id.* ¶ 16.)  Such an order requires that inmates not be placed in the same housing assignment as another inmate named in the Keep Separate order.  (*Id.*)  All corrections officers at CVRJ are trained on these policies and procedures and are taught to ensure inmates with Keep Separate orders are actually kept separate from one another.  (*Id.* ¶ 17.)

Because Allen and Davis were co-defendants in the same criminal case, a Keep Separate order was generated by CVRJ's Offender Management System ("OMS").  (*Id.* ¶ 18.)  Allen was aware that Davis was housed in F-Block, a general population housing assignment.  (*Id.* ¶¶ 20–22.)  On August 30, 2023, Allen was being held in a segregation unit, away from CVRJ's general population, but was moved into F-Block.  (*Id.* ¶¶ 19–20.)  When Defendant C.O. Walker began to escort Allen to F-Block, Allen informed him that Davis was housed in F-Block and that there was a Keep Separate order in place between them.  (*Id.* ¶ 23.)  Despite that information, Walker continued moving Allen to F-Block.  (*Id.* ¶ 24.)

As Walker moved Allen to F-Block, Defendant Lieutenant Blagriff walked past them and asked which housing unit Allen was being assigned to.  (*Id.* ¶ 25.)  After Walker told Blagriff that Allen was being moved to F-Block, Allen asked Blagriff whether any of his co-defendants were also housed in F-Block.  (*Id.* ¶ 26.)  Blagriff responded that Allen had no Keep Separate orders in his file.  (*Id.* ¶ 27.)  However, had Walker or Blagriff checked CVRJ's

2

OMS, they would have seen that there was a Keep Separate in place for Allen and Davis.  (*Id.* ¶ 29.)  After Allen inquired further about the status of his co-defendants and his Keep Separates, Blagriff responded "I don't know . . . that's where the Colonel wants you at."  (*Id.* ¶ 28.)

About 17 minutes after Allen was transferred to F-Block, Davis and another inmate, Anthony J. Young, entered the housing unit.  (*Id.* ¶ 33.)  After Davis called Allen into a cell under the guise of wanting to talk, Davis and Young viciously assaulted and battered Allen, causing him to lose consciousness and sustain serious injury.  (*Id.* ¶ 34.)  Allen suffered a broken jaw and fractured orbital bone, and was transferred to a nearby emergency department.  (*Id.* ¶ 35.)

In the days before Allen's transfer to F-Block, Defendant Officer John Doe was a member of CVRJ's Institutional Classification Committee (the "ICC"), a group charged with recommending an inmate's classification and assignment to a segregation unit, as well as reviewing classifications to determine if and when an inmate should be transferred back to a general population housing unit.  (*Id.* ¶¶ 36, 38.)  CVRJ's policies required Doe to thoroughly examine Allen's file before reclassifying Allen and moving him from a segregation unit to F-Block.  (*Id.* ¶ 45.)  However, Doe failed to comply with the Keep Separate order on file between Allen and Davis, despite its presence in the OMS.  (*Id.* ¶ 46.)

After the ICC proposes that an inmate be moved from a segregation unit to a general population unit, the recommendation is forwarded to the Chief Operations Officer or Superintendent of CVRJ for approval.  (*Id.* ¶ 39.)  At the time of Allen's transfer, Defendant Captain Bachert was the COO, Defendant Colonel Huffman was the Deputy Superintendent,

and Defendant Colonel Dyer was the Superintendent of CVRJ.  (*Id.* ¶ 40.)  Bachert, as the COO of CVRJ, was responsible for overseeing the relocation of inmates, approving transfers, making housing assignments, addressing inmates' requests for protective custody, and amending housing assignments based on changing security needs.  (*Id.* ¶¶ 41–42.)  In fact, Bachert ordered Blagriff to move Allen from F-Block to a segregation unit after the assault took place.  (*Id.* ¶ 42.)  Dyer, as Superintendent of CVRJ, was responsible for approving inmate transfers from segregation units to general population units, as well as overseeing inmate relocations within CVRJ.  (*Id.* ¶ 43.)  Huffman, as Deputy Superintendent, shared many of the same responsibilities as Dyer.  (*Id.* ¶ 44.)

Bachert, Dyer, and Huffman failed to comply with the Keep Separate order for Allen and Davis, despite observing it in the OMS when approving the ICC's recommendation for reclassifying Allen.  (*Id.* ¶ 48.)

Apart from the OMS, CVRJ uses a "Location Board System" that catalogs current pretrial detainees and inmate behavior so that information and data about unit housing can be reviewed by CVRJ personnel.  (*Id.* ¶ 51.)  Blagriff, as the Shift Supervisor on the day of Allen's transfer, reported directly to Bachert, and together they shared responsibility for supervising the inmate movement and preparing relocation rosters.  (*Id.* ¶ 52.)  The roster information includes an inmate's full name, the location they were moved from, and their new location.  (*Id.* ¶ 53.)  The roster is then forwarded to the Booking Officer on duty, who enters the data into the OMS.  (*Id.*)  Finally, the rosters are also placed on the Location Board of the Booking Area.  (*Id.*)  On the day of Allen's transfer, Blagriff tasked Gray with notating inmate movement on the roster.  (*Id.* ¶ 54.)  After Blagriff saw Allen transported by Walker, Blagriff

4

informed Gray that Allen was being moved from a segregation unit to F-Block in order for Gray to document the movement. (*Id.* ¶ 55.) In the relocation roster that Gray annotated, a bold and highlighted message at the bottom reminded him to "VERIFY THAT THERE ARE NO KEEP SEPARATES." (*Id.* ¶ 56.) Gray disregarded that reminder and did not verify that Allen had no Keep Separate orders that would impact his transfer. (*Id.* ¶ 57.) If Gray had reviewed the OMS or the Location Board after noting the transfer, he could have prevented Allen's transfer and brutal assault by Davis and Young. (*Id.* ¶ 59.)

On August 29, 2024, Allen filed a two-count complaint in the U.S. District Court for the Western District of Virginia. (*See* Civil Cover Sheet (Dkt. 1-1).) In Count I, Allen asserts a claim under the Fourteenth Amendment against all Defendants. (Compl. ¶¶ 60–70.) Under that Amendment, Allen claims a right to be "free from cruel and unusual punishment and to adequate, safe, secure, and humane conditions of detention and confinement, including constitutional protections from inhumane conditions of confinement through Defendants' deliberate indifference to his safety." (*Id.* ¶ 61.)

In Count II, Allen asserts a claim under Virginia tort law for "Gross Negligence/Willful & Wanton Negligence" against all Defendants. (*Id.* ¶¶ 71–81.) Allen submits that because of their knowledge of CVRJ's policies, "Defendants had a duty to follow these procedures to ensure inmate safety." (*Id.* ¶ 73.) Allen claims that Defendants acted without any care for Allen's safety by reclassifying him and by transferring him from the segregation unit to F-Block despite knowing that one of his co-defendants was there. (*Id.* ¶¶ 74–75.) In particular, Allen claims that Dyer, Huffman, Bachert, and Doe acted without any care for Allen's safety by recommending and approving the reclassification despite the Keep Separate order's

presence. (*Id.* ¶ 76.)  Additionally, Allen claims that Walker and Blagriff acted without any care for Allen's safety by causing and allowing him to be moved despite informing them that his co-defendant was being housed in F-Block, that he had a Keep Separate order on file, and that CVRJ's policy prohibited co-defendants from residing in the same housing unit. (*Id.* ¶ 77.) Finally, Gray acted without any care for Allen's safety by allowing Allen to be moved despite subjective knowledge of Allen's co-defendant and Keep Separate status. (*Id.* ¶ 78.)

As a result, Allen claims he suffered monetary, physical, and emotional injuries from the constitutional violations, pain, and costs associated with his medical treatment. (*Id.* at 13–14.)  Allen requests compensatory and punitive damages in an amount determined by a jury, as well as pre-judgment and post-judgment interest. (*Id.* at 14.)  Finally, Allen requests the court award expenses reasonably incurred in the litigation, including reasonable attorneys' fees and expert fees, pursuant to 42 U.S.C. §§ 1988(b) and (c). (*Id.*)

While Allen was able to serve Bachert, Dyer, and Blagriff in his first attempt, summonses were returned unexecuted for Walker, Gray, Huffman, and Doe. (*See* Dkts. 11–17.) Eventually Walker, Gray, and Huffman were served. (*See* Dkts. 41–43.) However, it does not appear that Allen ever attempted service on Doe again.

The six Defendants who were served have filed motions to dismiss Allen's complaint.

## II.    Standard of Review

Motions to dismiss under Rule 12(b)(6) test the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  They do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (quoting *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir.

2016)).  To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In reviewing a motion to dismiss for failure to state a claim, "a court must consider the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Bing*, 959 F.3d at 616.  Evaluation is generally limited to the complaint itself.  Fed. R. Civ. P. 12(d).  However, a court may also examine documents attached to the complaint as exhibits or those explicitly incorporated into the complaint by reference.  Fed. R. Civ. P. 10(c); *see Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016).

### III.    Analysis

Defendants offer similar and sometimes overlapping arguments as to why the two claims in Allen's complaint should be dismissed.  The court addresses those arguments together when appropriate.

### A.    Count I:  Failure to State a Fourteenth Amendment Due Process Claim

As a starting point, the court notes that, to the extent Allen alleges "mere negligence" or "mistake," he does not plead a constitutional harm.  *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977); *see Short v. Hartman*, 87 F.4th 593, 611–12 (4th Cir. 2023) (reaffirming this principle).  As a pretrial detainee, however, Allen need not plead "the heightened, subjective Eighth Amendment deliberate indifference standard."  *Short*, 87 F.4th at 609 (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 400–01 (2015)).

7

A pretrial detainee sufficiently states a Fourteenth Amendment claim for deliberate indifference to a serious risk of harm (a "failure-to-protect" claim) on the "purely objective basis that the 'governmental action' they challenge is not 'rationally related to a legitimate nonpunitive governmental purpose' or is 'excessive in relation to that purpose.'"  *Id.* at 611 (quoting *Kingsley*, 576 U.S. at 398).  This requires Defendants to have "intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed." *Id.*  Put differently, the plaintiff must establish that the defendant's action or inaction was "objectively unreasonable."  *Id.* (quoting *Kinglsey*, 576 U.S. at 397).

Under this objective standard, "[t]he plaintiff [need not] show that the defendant had actual knowledge of the [condition at issue] and consciously disregarded the risk that their action or failure to act would result in harm."  *Id.*  Instead, "it is enough that the plaintiff show that the defendant acted or failed to act 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'"  *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)).  It is not enough, however, "for the plaintiff to allege that the defendant negligently or accidentally failed to do right by the detainee."  *Id.* at 611–12.

1. Blagriff (Dkt. 21)

Blagriff first argues that the facts alleged against him "do not amount to even simple negligence."  (Dkt. 22 at 9.)  And even if the facts did amount to negligence, "that is not sufficient for liability" under the Fourteenth Amendment.  (*Id.*)  In particular, Blagriff claims that Allen did not allege that he reported any threat from Davis and did not request a Keep Separate order from Blagriff.  (*Id.* at 10.)  According to Blagriff, the complaint alleges that

*others*, not Blagriff, were responsible for examining Allen's file and reviewing any Keep Separate orders. (*Id.*)

Allen responds that his complaint's description of the conversation between Allen and Blagriff as he was being transferred adequately pleads a violation of the Fourteenth Amendment. (Dkt. 25 at 4–7.) Allen's complaint includes factual allegations that Blagriff walked by Allen as he was being moved from the Segregation unit to F-Block. (Compl. ¶ 25.) After Allen asked Blagriff whether any of his co-defendants were in F-Block, Blagriff replied that there were no Keep Separates in his file. (*Id.* ¶¶ 26–27.) The complaint alleges that "Allen inquired further into the status of his co-defendants and his Keep Separates," to which Blagriff responded "I don't know . . . that's where the Colonel wants you at." (*Id.* ¶ 28.) Allen claims that Blagriff cannot shirk responsibility because he "declined to confirm inferences of risk that he strongly suspected to exist." (Dkt. 25 at 6 (quoting *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995)).) Allen argues that Blagriff is wrong to fault him for not reporting prior threats from Davis, as the failure to give advance notice is not dispositive if a defendant is aware of a serious risk to a plaintiff but took no protective action. (*Id.*) Finally, Allen claims that a "protocol violation" demonstrates that Blagriff knew of and disregarded a substantial risk of serious injury to the detainee." (*Id.* at 6–7.)

Blagriff replies that the complaint does not allege that Blagriff knew that Allen's co-defendant, Davis, was in F-Block, and also does not allege that Allen told him of that fact. (Dkt. 29 at 6.) Thus, Blagriff claims he had no actual knowledge of any Keep Separate order for Allen. As support, Blagriff points to the complaint, which alleges that Blagriff responded "I don't know" when asked by Allen about the presence of any Keep Separate order. (*Id.* at

6–7.) Finally, Blagriff argues that any "protocol violation" is insufficient to support a claim against him because *others* were responsible for classifying, making assignments, and examining the files, not Blagriff. (*Id.* at 7–9.)

Blagriff's argument is not persuasive. Drawing all reasonable inferences in favor of Allen at this stage, the court finds that the complaint contains factual allegations that make Blagriff's action, or rather, inaction, objectively unreasonable. When Allen "inquired further" about the status of his co-defendants with Blagriff, (Compl. ¶ 28), it is a reasonable inference that Allen was inquiring about Davis. That is so because Allen "was aware that Inmate Davis was in F-Block," "reasonably feared for his own safety should he be moved to F-Block," and had moments earlier "informed [Walker] that his co-defendant was being housed in F-Block and that there was a Keep Separate order for the two of them." (*Id.* ¶¶ 22–23; *see also* ¶ 64 ("By virtue of . . . Mr. Allen directly informing them of his and Inmate Davis's co-defendant status and Keep Separate order, Officer Walker and Lieutenant Blagriff were made subjectively aware that Mr. Allen faced a substantial risk of serious harm due to his being placed in the same housing unit as his co-defendant, Inmate Davis.").) As a result, the complaint sufficiently alleges that Blagriff "acted or failed to act 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Short*, 87 F.4th at 611 (quoting *Farmer*, 511 U.S. at 836). The complaint alleges that (1) Blagriff had knowledge of a substantial risk that Allen would be injured if he were moved to F-Block because Allen inquired into the status of Davis and his Keep Separate orders and (2) Allen informed Blagriff about Davis and the Keep Separate order. Accordingly, the court will deny Blagriff's motion to dismiss Count I on this ground.

10

2. <u>Bachert and Dyer (Dkt. 27)</u>

Bachert and Dyer make three arguments as to why Allen's Fourteenth Amendment claim fails. First, they argue that the complaint contains "insufficient allegations of personal involvement" because at most they had "oversight authority of inmate movement." (Dkt. 28 at 6.) They claim that neither "were actually involved in the decision to transfer Allen" to F-Block. (*Id.*) Bachert and Dyer also take issue with Allen's "global" manner of pleading, in which multiple Defendants are alleged to have caused Allen's transfer and disregarded their training. (*Id.* at 7.) Allen responds to Bachert's and Dyer's claimed lack of involvement by asserting that the complaint alleges the two were responsible for approving inmate transfers and were required to thoroughly review inmate files beforehand. (Dkt. 32 at 5, 7.) By approving Allen's transfer to F-Block, Allen argues, Bachert and Dyer created a substantial risk of serious harm that Davis would assault Allen. (*Id.* at 7.)

While Bachert and Dyer claim that neither were involved in Allen's transfer, his complaint states otherwise. The complaint alleges that Bachert and Dyer not only were required to review Allen's file before a transfer, (Compl. ¶ 47), thereby failing to comply with prison policy, (*id.* ¶¶ 16, 48), but that they "caused Mr. Allen to be moved" to F-Block, (*id.* ¶ 50). The court accepts those factual allegations as true for present purposes and finds that Allen has alleged that *each* of the defendants named within the paragraphs had a role in those actions. This does not constitute impermissible shotgun pleading as these allegations that collectively attribute responsibility to both Bachert and Dyer "provide[d] defendants with fair notice of the claims against them." *Blackman v. Boston Whaler, Inc.*, 649 F. Supp. 3d 142, 148 (E.D.N.C. 2023). These allegations are not "vague nor conclusory," and instead provide

11

Bachert and Dyer with notice of the nature of Allen's claims against them according to Federal Rule of Civil Procedure 8(a)(2). *Adams v. NaphCare, Inc.*, 243 F. Supp. 3d 707, 712 (E.D. Va. 2017); *see* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief"). While "[t]he Fourth Circuit has never held that group pleading is prohibited per se," *Hart v. Scholl's Wellness Co., LLC*, No. 2:21cv497, 2022 WL 18777382, at *3 (E.D. Va. July 29, 2022), a pleading must plausibly claim "that each defendant was involved in all of the facts as alleged," *McPherson v. Balt. Police Dep't*, 494 F. Supp. 3d 269, 280 (D. Md. 2020) (internal quotation marks omitted). Based on the plausible facts alleged in the complaint, the court finds that Allen's allegations suffice at this time.

Second, Bachert and Dyer also rely on *Davidson v. Cannon*, 474 U.S. 344 (1986), and claim that unlike the facts of that case, there is no direct communication of a potential threat conveyed to them here. (Dkt. 28 at 7–8.) According to Bachert and Dyer, if the facts in *Davidson* "did not amount to a constitutional violation . . . then there is no constitutional violation here." (*Id.* at 8.) Allen responds that *Davidson* did not actually address what *constitutes* negligence, but only held that simple negligence does not equate to a constitutional violation. (Dkt. 32 at 7–8.) The court finds Allen's interpretation of *Davidson* to be persuasive in this context. *Davidson* is a short opinion that appears to assume for the purposes of the decision that the New Jersey prison officials "negligently failed to take reasonable steps to protect [petitioner], and that he was injured as a result." 474 U.S. at 346. Thus, the Supreme Court did not pass upon the question of whether the facts in *Davidson* amount to mere negligence.

Instead, the Court accepted the negligence finding below and held that negligence (as assumed) does not state a claim under Fourteenth Amendment Due Process.

Third, Bachert and Dyer argue that Allen's claim fails because he voluntarily entered the cell with Davis. (Dkt. 28 at 9.) Allen responds that he was forced to move to F-Block, and thus it was not a voluntary choice to be paired with his co-defendant in the same housing unit. (Dkt. 32 at 8.) Last year, in *Hodges v. Meletis*, the Fourth Circuit observed that

> [W]hen an inmate *can* choose to avoid a particular condition or activity or has the means to secure his own necessities, he necessarily has the power "to exercise responsibility for his own welfare." So, if the inmate exercises (or rather, abdicates) that responsibility by voluntarily exposing himself to a condition or activity, *prison officials* have not deprived him of any right or necessity. Rather, the prisoner has inflicted that deprivation upon himself.

109 F.4th 252, 260 (4th Cir. 2024) (citations omitted).

Bachert and Dyer suggest that Allen could have chosen to avoid a particular condition—the cell with Davis and Young—and thus had power to exercise responsibility over his own welfare. They argue that the voluntary exposure to Davis and Young means that Allen brought the assault upon himself, and the officers cannot be at fault.

*Hodges* is inapplicable here. In *Hodges*, the plaintiff voluntarily chose to participate in a work release program instead of quarantining from COVID-19 in his cell. *Id.* at 260–61. Thus, he failed to state a claim that he was unwillingly exposed to the risk of contracting COVID-19. *Id.* Here, Allen did not willingly go to F-Block. Indeed, he was apprehensive of such a transfer. (*See* Compl. ¶ 22 ("Allen reasonably feared for his own safety should he be moved to F-Block.").) In addition, the risk of co-defendants comingling exists when they cohabitate the same housing unit, not just when they enter the same cell. That's why the policies at issue

stress that "[i]nmates who have Keep Separate orders in their files are not to be placed in the *same housing assignment* as any other inmate named in the Keep Separate order." (*Id.* ¶ 16 (emphasis added).) Because Allen had no choice but to be transferred to F-Block, and because he protested such a transfer by telling Walker about Davis, the court finds that Allen did not voluntarily expose himself to risk. The court therefore will deny Bachert and Dyer's motion to dismiss Count I.

   3. Huffman (Dkt. 46)

Huffman makes two arguments as to why Allen's 42 U.S.C. § 1983 claim should be dismissed. (Dkt. 47 at 5–7.) First, Huffman argues that Allen's complaint makes only "categorical allegations" against him, and "[w]ithout any pleaded facts concerning personal conduct or knowledge by Col. Huffman," Allen's claim fails. (*Id.* at 6.) Second, Huffman argues that even if Allen has sufficiently identified Huffman's particularized conduct, the claim should still be dismissed because Allen failed to identify how "Huffman's conduct caused the transfer to occur," and without alleging communication of "the threat and risk posed by Davis," Huffman's failure to appreciate the Keep Separate order "amounts to simple negligence." (*Id.*)

Neither argument is persuasive. The complaint contains specific allegations about Huffman. The complaint states that on the date of Allen's transfer, "Huffman was the Deputy Superintendent of CVRJ" and was responsible for "approving inmate transfers from Segregation to General Population and overseeing inmate relocations within CVRJ." (Compl. ¶¶ 40, 44.) It is worth noting that some paragraphs do refer to multiple people at once in describing Huffman's actions. (*See id.* ¶ 48 ("*Captain Bachert, Colonel Dyer, and Colonel Huffman*

14

failed to comply with the Keep Separate order for Mr. Allen and Inmate Davis despite observing it in the OMS when they approved the ICC's recommendation that Mr. Allen be reclassified from Segregation to general population and moved to F-Block." (emphasis added).)  But as explained above, the court views that collective allegation as describing that all three defendants each individually failed to comply with the Keep Separate order, just as they each individually approved the transfer.  Allen has alleged that Huffman (along with the two other defendants) "approved the ICC's recommendation that [] Allen be reclassified from Segregation to general population and moved to F-Block" and thus Huffman "caused [] Allen to be moved from Segregation to F-Block."  (*Id.* ¶ 50.)  Accepting Allen's allegations as true, the court finds Allen has pleaded personal and sufficiently culpable conduct at this stage and will deny Huffman's motion to dismiss Count I.

4.  <u>Gray and Walker (Dkt. 48)</u>

Gray and Walker make several arguments as to why Allen's § 1983 claim fails.  First, they claim they did not actually access the Keep Separate order *before* moving Allen, which makes this case less egregious than *Davidson*, discussed above.  (Dkt. 49 at 9.)  Second, Gray and Walker argue that Allen did not communicate any particularized threat about Davis besides a generalized concern about co-defendants.  (*Id.*)  Any inaction on their part, so they claim, is at most a violation of internal policy which is not sufficient to rise to the level of a constitutional violation.  (*Id.*)  Allen responds that his conversation with Walker inquiring into whether his co-defendants were also in F-Block and expressing concerns about being housed alongside co-defendants was enough to support that Walker, at least, knew or should have known about a substantial risk of serious harm to Allen.  (Dkt. 53 at 4, 6.)

15

The court finds that Allen did allege a particularized threat about Davis to Walker. Taking the allegations in the complaint as true, Allen "was aware that Inmate Davis was in F-Block," "reasonably feared for his own safety should he be moved to F-Block," and "informed [Walker] that his co-defendant [Davis] was being housed in F-Block and that there was a Keep Separate order for the two of them." (Compl. ¶¶ 22–23.) Yet "[d]espite being informed of this, . . . Walker continued moving Mr. Allen to F-Block, where he then knew Mr. Allen's co-defendant was also residing." (*Id.* ¶ 24.) Thus, Walker's argument that Allen did not communicate a particularized threat about Davis is not persuasive, since he had just been informed they were co-defendants and that there existed a Keep Separate order for the two of them. Thus, the court finds that the complaint sufficiently alleges a Fourteenth Amendment claim against Walker.

On the other hand, Allen's complaint does not sufficiently allege a Fourteenth Amendment violation against Gray. Gray was tasked by Blagriff to notate inmate movement in a roster. (*Id.* ¶ 54.) "Several minutes after seeing Mr. Allen with C.O. Walker, Lieutenant Blagriff informed C.O. Gray that Mr. Allen had been moved from Segregation to F-Block in order for C.O. Gray to document it in the roster." (*Id.* ¶ 55.) Allen alleges that at the bottom of the roster, a message stating "VERIFY THAT THERE ARE NO KEEP SEPARATES" reminds officers to check for such orders. (*Id.* ¶ 56.) But Allen does not allege that Gray violated CVRJ policies, just that this "all-caps" command was at the bottom of the roster. In addition, the actions Allen alleges Gray took in violation of his rights appear to occur *after* the transfer had been initiated, so it is difficult to find that Gray disregarded a substantial risk to Allen's safety with respect to the move. Thus, assuming the facts alleged in the complaint as

true, Gray has been negligent at most—something that does not rise to the level of a constitutional violation.

Thus, the court will grant in part, and deny in part, Gray and Walker's motion to dismiss Count I. The court will grant the motion with respect to Gray and will deny the motion with respect to Walker. Count I with respect to Gray will be dismissed.

Because the complaint sufficiently alleges a Fourteenth Amendment violation against Blagriff, Bachert, Dyer, Huffman, and Walker, the court now will analyze arguments concerning qualified immunity with respect to Count I.

## B.    Count I: Qualified Immunity

Nearly all Defendants raise the affirmative defense of qualified immunity.[2] (Dkt. 22 at 20–23 (Blagriff); Dkt. 28 at 5, 8–9 (Dyer and Bachert); Dkt. 49 at 10–12 (Walker and Gray).) As a result, the court will consider their claims together.

Defendants principally claim that Allen has not pleaded facts showing that any constitutional violation was "clearly established" at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Allen responds that "the constitutional right at issue is [] Allen's Fourteenth Amendment right to be protected from violence committed by other prisoners." (Dkt. 25 at 9.) Allen also claims that the right was clearly established as of August 30, 2023. (*See id.* at 10 (collecting cases).) In reply, Gray and Walker suggest that Allen has not asserted a right with the correct level of specificity for the qualified immunity analysis.

---

[2] Huffman does not mention the doctrine of qualified immunity in his motion briefing. "[Q]ualified immunity is an affirmative defense, and the burden of pleading it 'rests with the defendant.'" *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 305 (4th Cir. 2006) (quoting *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)). As a result, qualified immunity can be waived if it is not "squarely presented" to the court. *Sales v. Grant*, 224 F.3d 293, 296 (4th Cir. 2000). In general, "qualified immunity must be raised in an answer or a dismissal motion." *Ridpath*, 447 F.3d at 305.

(Dkt. 55 at 2.) They claim that Allen submits a generalized right to be protected from violence committed by other prisoners, when the appropriate question is whether it was "clearly established at the time [of the events alleged in the complaint] that an officer's failure to follow an internal policy requiring the separation of co-defendants would violate an inmate's Fourteenth Amendment rights in the absence of information about an individualized or specific threat." (*Id.*)

In analyzing qualified immunity, the court asks two questions: (1) "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right," and (2) "whether the right at issue was clearly established at the time of [the] defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (internal citations and quotation marks omitted). The court may choose the order in which to address the two prongs.

To determine whether a right is clearly established, the court "first examine[s] . . . decisions of the Supreme Court, [the Court of Appeals for the Fourth Circuit], and [the Supreme Court of Virginia]. [Courts] ordinarily need not look any further than decisions from these courts." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538 (4th Cir. 2017) (internal citations and quotation marks omitted). In determining whether a right is clearly established, it is not required that a case be directly on point. *Mullenix v. Luna*, 577 U.S. 7, 12 (2015). Instead, it is required that "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *al–Kidd*, 563 U.S. at 741). "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Id.* (quoting *al–Kidd*, 563 U.S. at 741). As a result, the inquiry "must be undertaken in light of

the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

The court should begin by defining the right at issue, and then move to reviewing whether that right is clearly established. *See Scinto v. Stansberry*, 841 F.3d 219, 235 (4th Cir. 2016). In defining the right, the court must be careful "not to define clearly established law at a high level of generality." *al–Kidd,* 563 U.S. at 742. "Defining the right at a high level of generality avoids the crucial question whether the officer acted reasonably in the particular circumstances that he or she faced." *Balogh v. Virginia*, 120 F.4th 127, 138 (4th Cir. 2024) (quoting *Atkinson v. Godfrey*, 100 F.4th 498, 505 (4th Cir. 2024)).

For example, in *Knibbs v. Momphard*, the Fourth Circuit rejected a right defined generally such as the "right to be free from the use of excessive force, because that right is defined at too high [a] level of generality." 30 F.4th 200, 223 (4th Cir. 2022) (internal quotation marks omitted); *see also Rambert v. City of Greenville*, 107 F.4th 388, 402 (4th Cir. 2024) (finding an asserted "right to be free from deadly force once the danger [the plaintiff] posed had passed" was "too general"). Instead, the Fourth Circuit required the right to be defined *specifically* as the right be free from an officer using "deadly force against a homeowner who possesses a firearm inside his own home while investigating a nocturnal disturbance but does not aim the weapon at the officer or otherwise threaten him with imminent deadly harm." *Knibbs*, 30 F.4th at 223. And in *King v. Riley*, the Fourth Circuit again emphasized specific conduct, analyzing the "right to have to have [sic] a correctional officer look into the cell window while

conducting a security check—given a known and substantial risk of inmate-on-inmate violence in the Unit." 76 F.4th 259, 266 (4th Cir. 2023).[3]

Allen's asserted right is at too high a level of generality. The "right to be protected from violence committed by other prisoners" is a general statement and does not take into account the particular circumstances or conduct of Defendants in this case. The Fourth Circuit has rejected a similar generalized right in *King*. There, the plaintiff asserted that the right at issue was "the general right to be protected from inmate violence." *King*, 76 F.4th at 266 n.8. But the court found that formulation "defines the right too broadly" because "the critical inquiry is whether case law alerted [the defendant] that his conduct was constitutionally deficient." *Id.*

Defendants assert a more plausible right to be analyzed: whether it was "clearly established at the time that an officer's failure to follow an internal policy requiring the separation of co-defendants would violate an inmate's Fourteenth Amendment rights in the absence of information about an individualized or specific threat." (Dkt. 55 at 2.) The last part of that formulation, however, potentially proves too much for some Defendants. As explained above, there was some information about an individualized or specific threat known to Walker and Blagriff based on their conversations with Allen before and during the transfer. As a result, for Walker and Blagriff, the court analyzes whether the right not to be moved from a segregation unit to a general population unit by an officer after alerting the officer to the presence of a co-defendant, when there is an internal policy requiring the separation of co-

---

[3] The Court in *King* also noted that the substantial risks involved "must be more specific than 'the general risks that all the inmates posed to one another and prison officials.'" *Id.* at 266 n.7 (quoting *Rich v. Bruce*, 129 F.3d 336, 338 (4th Cir. 1997)).

defendants, was clearly established.  And as to the supervisor Defendants, the court analyzes whether the right to be free from an officer's failure to follow internal policies requiring the separation of co-defendants would violate an inmate's Fourteenth Amendment rights in the absence of information about an individualized or specific threat was clearly established.  As shown below, however, neither right is clearly established.

In his memorandum, Allen cites only one Fourth Circuit case—*Pressly v. Hutto*, 816 F.2d 977 (4th Cir. 1987)—to show that his right is clearly established.  (Dkt. 53 at 10.)  In that case, the plaintiff-inmate was hurt in an altercation with three other inmates.  *Pressly*, 816 F.2d at 978.  The officer in charge interviewed all four inmates and asked each if they wanted to be separated from the others.  *Id.*  The officer reported that none of the inmates wanted to be separated.  However, the plaintiff disputed this and claimed that he had asked the officer to be separated from the three other inmates.  Nevertheless, he was still returned to the same dormitory.  *Id.*  The same night, after the officer in charge had made a personal check of the dormitory, one of the three inmates assaulted the plaintiff-inmate, striking him with a large, metal padlock.  *Id.*  The court then provided a general statement of law that the "[E]ighth [A]mendment protects a convicted inmate from physical harm at the hands of fellow inmates resulting from the deliberate or callous indifference of prison officials to specific known risks of such harm."  *Id.* at 979.  The court found that the district court ignored a genuine dispute of material fact as to whether the plaintiff wanted to return to the dorm or not, and reversed the district court's granting of summary judgment.  *Id.*

The facts in *Pressly* differ from the situation at issue here in several critical respects. First, there is no reference to prison policy or officer training in *Pressly*.  Meanwhile, Allen's

complaint heavily relies on the violation of standard protocol to substantiate his deliberate indifference claim. Second, in *Pressly*, there was a specific and real threat to the plaintiff that the officer in charge had actual knowledge of. Indeed, the officer in charge interviewed the very inmates who perpetrated the first assault on the plaintiff. And cognizant of the risks of that threat, he asked the inmates whether they wanted to be separated from each other. Allen's complaint relies heavily on the existence of a Keep Separate order that was automatically generated in OMS due to Davis's presence, without regard to any particularized threat or risk of violence. Third, in *Pressly*, the officer in charge affirmatively chose how to respond to the situation following the first assault, including potentially separating the inmates. Here, Allen's movement was a preplanned transfer that was carried out by officers following orders from their superiors. These facts, considered together in the context of Allen's move, materially distinguish this case from *Pressly*.

In addition to *Pressly*, Allen cites a number of district court cases. But it remains unclear how the court should treat district court cases in the qualified immunity analysis. It is true that without controlling authority "a robust consensus of persuasive authority may demonstrate the existence of a rule that every reasonable official would know." *Garrett v. Clarke*, 74 F.4th 579, 584 (4th Cir. 2023) (internal quotation marks omitted). However, district court opinions normally cannot clearly establish rights in the qualified immunity analysis. *Hum. Rts. Def. Ctr. v. Ishee*, 726 F. Supp. 3d 482, 501 (E.D.N.C. 2024); *see Booker*, 855 F.3d at 538 n.1 (noting that because "[a] decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case . . . [m]any Courts of Appeals [] decline to consider district court precedent when

22

determining if constitutional rights are clearly established for purposes of qualified immunity"
(internal quotation marks omitted)).  As a result, the court finds that Allen's four additional
cases do not constitute the robust consensus of persuasive authority required.[4]

Accordingly, the court finds that qualified immunity applies to Defendants Blagriff,
Dyer, Bachert, and Walker.  Count I will be dismissed as to these Defendants.

### C.    Count II:  Gross Negligence/Willful & Wanton Negligence

Allen's complaint also brings a single count under Virginia tort law for "Gross
Negligence/Willful & Wanton Negligence" against all Defendants.  (Compl. ¶¶ 71–81.)  While
Allen's complaint asserts that claim as a single cause of action, Virginia law separates the two
based on "different levels of negligence."  *Cantrell v. McCoy*, 553 F. Supp. 3d 295, 306 (W.D.
Va. 2021).

"Gross negligence is 'a degree of negligence showing indifference to another and an
utter disregard of prudence that amounts to a complete neglect of the safety of such other
person.'"  *Elliott v. Carter*, 791 S.E.2d 730, 732 (Va. 2016) (quoting *Cowan v. Hospice Support Care*,

---

[4] Even if considering the district court opinions that Allen cites, the rights to either (i) not be moved from a segregation
unit to a general population unit by an officer after alerting the officer to the presence of a co-defendant, when there is an
internal policy requiring the separation of co-defendants, or (ii) be free from an officer's failure to follow internal policies
requiring the separation of co-defendants in the absence of information about an individualized or specific threat are far
from clearly established.  *Singleton v. Wade* involved a three-and-a-half-hour assault, perpetrated by two individuals who had
a recent history of assaulting other inmates, during which the victim-inmate yelled repeatedly for help and various
defendants signed off on verifying that cell checks were completed every half-hour.  No. 3:21cv553, 2022 WL 4349826, at
*3–4 (E.D. Va. Sept. 19, 2022).  This case does not clearly establish the rights Allen asserts.  In both *Smith v. Hardy* and
*McFadden v. Allison*, the court analyzed a generalized right to be free from inmate violence, unhelpful to determining
whether the specific rights above were clearly established.  *Smith v. Hardy*, No. 7:14-cv-00477, 2015 WL 5562197, at *7
(W.D. Va. Sept. 21, 2015); *McFadden v. Allison*, Civ. No. 08-0154, 2009 WL 3247358, at *5 (D. Md. Oct. 9, 2009).  Though
it may have determined that some rights were clearly established, such a generalized approach is not sufficient under *King
v. Riley*.  And finally, *Rucker v. Piedmont Regional Jail Authority* involved an assault by an inmate known to be dangerous and
had pled guilty to a violent murder who was improperly placed in a housing pod for elderly and infirm inmates, where jail
officials had failed to monitor the pod and failed to intervene to stop the assault.  No. 3:21cv412, 2021 WL 3863346, at *1
(E.D. Va. Aug. 30, 2021).  The right in that case differs from this case due to the advance knowledge of the perpetrator's
propensity for violence as well as the complete lack of monitoring and response from prison officers.  At bottom, Allen's
citations to district court cases do not clearly establish the rights at issue.

*Inc.*, 603 S.E.2d 916, 918 (Va. 2004)).  Under Virginia law, "the standard for gross negligence is one of indifference, not inadequacy." *Kuykendall v. Young Life*, 261 F. App'x 480, 491 (4th Cir. 2008); *see Williams v. Kincaid*, 45 F.4th 759, 776–77 (4th Cir. 2022) ("[M]erely inadequate care is insufficient to make out a claim of gross negligence.").

Where the defendant exercised "some degree of care," a gross negligence claim must fail as a matter of law. *Elliott*, 791 S.E.2d at 732.  "'It is a heedless and palpable violation of legal duty respecting the rights of others' which amounts to the 'absence of slight diligence, or the want of even scant care.'" *Chapman v. City of Va. Beach*, 475 S.E.2d 798, 801 (Va. 1996) (quoting *Town of Big Stone Gap v. Johnson*, 35 S.E.2d 71, 73 (Va. 1945)).  Finally, "[o]rdinarily, the question whether gross negligence has been established is a matter of fact to be decided by a jury." *Frazier v. City of Norfolk*, 362 S.E.2d 688, 691 (Va. 1987).  A court should rule on gross negligence only when "reasonable minds could not differ." *Id.*

Meanwhile, willful and wanton conduct is defined as "acting consciously in disregard of another person's rights or acting with reckless indifference to the consequences, with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another." *Cowan*, 603 S.E.2d at 919 (quoting *Etherton v. Doe*, 597 S.E.2d 87, 90 (Va. 2004)).  Willful and wanton conduct involves an even greater degree of culpability than gross negligence.  "A plaintiff that fails to prove gross negligence has, by definition, failed to prove willful and wanton conduct." *Cantrell*, 553 F. Supp. 3d at 307 (collecting Virginia cases).

Allen submits that because of their knowledge of CVRJ's policies, Defendants "had a duty to follow these procedures to ensure inmate safety." (Compl. ¶ 73.)  Allen claims that

Defendants acted without any care for Allen's safety by reclassifying him and by transferring him from the segregation unit to F-Block despite knowing that one of his co-defendants was residing there. (*Id.* ¶¶ 74–75.) In particular, Allen claims that Dyer, Huffman, Bachert, and Doe acted without any care for Allen's safety by recommending and approving the reclassification despite the Keep Separate order's presence. (*Id.* ¶ 76.) Additionally, Allen claims that Walker and Blagriff acted without any care for Allen's safety by causing and allowing Allen to be moved despite Allen informing them that his co-defendant was being housed in F-Block, that he had a Keep Separate order on file, and that CVRJ's policy prohibited co-defendants from residing in the same housing unit. (*Id.* ¶ 77.) Finally, Gray acted without any care for Allen's safety by allowing Allen to be moved despite subjective knowledge of Allen's co-defendant and Keep Separate status with Davis. (*Id.* ¶ 78.)

All Defendants make essentially the same arguments as to why Allen's gross negligence/willful & wanton conduct claims fail. Accordingly, the court will consider the motions together.

1. <u>Internal policies.</u>

Defendants argue that Allen's state law claims are "based solely on the internal policies" of CVRJ "and should be dismissed" because he has not alleged an adequate standard of care. (Dkt. 28 at 11 (Dyer and Bachert); *see also* Dkt. 22 at 17 (Blagriff); Dkt. 49 at 12–14 (Gray and Walker); Dkt. 47 at 7 (Huffman).) According to Defendants, "[i]nternal policies do not set a standard of care for even a simple negligence claim . . . [l]et alone for [a] gross negligence/willful and wanton negligence claim." (Dkt. 22 at 17.) And according to Huffman, the applicable standard of care in this case is whether Defendants' conduct concerning Allen

"amounted to indifference for [his] safety, not if [Defendants] violated any internal policy."
(Dkt. 47 at 8.)  So, Huffman claims that the "failure to accurately apply or oversee an internal
housing policy would not shock a fair-minded person."  (*Id.*)

Allen responds in a similar way to each Defendant.  While Allen concedes that CVRJ's
internal policies cannot establish the applicable standard of care, he also argues that the policies
provide evidence that Defendants were on notice of the risk of significant harm created by
putting Allen in the same housing unit as Davis.  (Dkt. 50 at 9; *see also* Dkt. 53 at 11.)
Accordingly, Allen claims that Defendants' knowledge of and training on CVRJ's policy
regarding Keep Separate orders shows that they knew their actions would likely cause injury
to Allen.  (Dkt. 50 at 10.)

Under Virginia law, "[t]he long standing rule . . . is that private rules of conduct are not
admissible to show the standard of care."  *Owens v. Children's Hosp. of the King's Daughters, Inc.*,
45 Va. Cir. 97, 1997 WL 33616939, at *3 (Va. Cir. Ct. 1997).  Accordingly, "it is well settled
that internally promulgated policies cannot serve as the basis of establishing a duty of care
supporting a negligence claim."  *Warner v. Centra Health Inc.*, 503 F. Supp. 3d 479, 500 (W.D.
Va. 2020).

Defendants are correct that while alleging his state law claim, Allen asserts that "[g]iven
their knowledge of *CVRJ's internal policies* on inmate classification, reclassification, and housing
transfers, Defendants had a duty to follow these procedures to ensure inmate safety."  (Compl.
¶ 73 (emphasis added).)  Defendants are likely correct that simply pointing to CVRJ policy is
not enough.  However, familiarity with internal policies, when combined with additional facts,
such as prior knowledge of specific risks and the failure to take reasonable precautions to

26

mitigate those risks, may be enough to establish a duty of care. *See DJ ex rel. Hughes v. Sch. Bd. of Henrico Cnty.*, 488 F. Supp. 3d 307, 342 (E.D. Va. 2020) (finding that "reasonable minds could easily find that the [school administrator] Defendants had prior knowledge based on *both* a specific warning (conveyed to them by [the plaintiff's] father) and their specialized training as school administrators").

For the supervisory Defendants, Allen has not alleged much by way of specialized training or prior knowledge of risks. His complaint bases Defendants' knowledge of the Keep Separate orders solely on "CVRJ's policies and procedures" which "[a]ll correctional officers at CVRJ, including Defendants, are trained on." (Compl. ¶¶ 16–17.) Without a specific warning about Davis, or other specialized training grounded in the policy, Allen has not stated a claim against Gray, Bachert, Huffman, or Dyer.

However, for Walker and Blagriff—who communicated directly with Allen as he was being moved—things are different. As detailed above, Allen alleges that he knew Davis was housed in F-Block before he was moved. (*Id.* ¶ 22.) And Allen alleges that he was scared of being moved there. (*Id.*) When the move was initiated, Allen informed Walker that Davis was being housed there and that there was a Keep Separate order for the two of them. (*Id.* ¶ 23.) Additionally, Allen "inquired further" about Davis' status with Blagriff. (*Id.* ¶ 28.) Indeed, Allen alleges that he directly informed both Walker and Blagriff about Davis's co-defendant status and location in F-Block. (*Id.* ¶¶ 64, 77.) This specific warning, accompanied by the training that Walker and Blagriff have had, sufficiently alleges a duty of care that is not based purely on CVRJ's internal policies.

27

The court will dismiss Count II against Gray, Bachert, Huffman, and Dyer. The court continues the analysis with respect to Walker and Blagriff.

2. *Some degree of care.*

Defendants also argue that Allen's allegations do not rise to the level of gross negligence because the complaint establishes that CVRJ acted with "some degree of care" towards Allen. In particular, they argue that the existence of CVRJ's policy prohibiting co-defendants from residing in the same housing unit shows that they offered some degree of care toward Allen. (Dkt. 49 at 14–15.)

Defendants, however, offer little support for their position that the mere existence of an internal policy can show that they acted with "some degree of care." In fact, binding and persuasive authority indicate that non-compliance with a policy can show that a defendant *did not* show any degree of care. *See Williams*, 45 F.4th at 779 ("Taking the allegations in the complaint as true, as we must, [the defendant] did not attempt to comply with the prison's policy on body searches and thus cannot be said to have exhibited any degree of care toward [the plaintiff]."); *cf. Jordan v. Holmes*, No. 3:23cv351, 2024 WL 5357016, at *3 (E.D. Va. Dec. 17, 2024) (finding that a gross negligence claim against prison official fails because "*compliance* with the Virginia Administrative Code in performing security checks of Pod 5C indicate that he exercised at least some degree of care to ensure inmate safety"). Thus, it is not the existence of the policy that matters when attempting to show "some degree of care" taken, but whether the policy was followed.

Throughout his complaint, Allen alleges that Defendants did not follow proper CVRJ policy. For example, despite Allen explaining to Walker (and inquiring of Blagriff) his concern

that he was being moved to F-Block where his co-defendant was residing, and alerting them to the existence of a Keep Separate order, (Compl. ¶¶ 23, 28), the move violated CVRJ's policies and procedures that require inmates who have Keep Separate orders to be placed in different housing assignments, (*id.* ¶ 16). Walker and Blagriff have not persuasively shown that they exhibited "some degree of care" through the mere existence of the CVRJ policies. As a result, the court will deny Walker's and Blagriff's motions to dismiss Count II.

## IV. Conclusion

For the foregoing reasons, the court will **GRANT** the motions to dismiss Count I with respect to all Defendants except for Huffman. Accordingly, the court will **GRANT** Blagriff's, Bachert and Dyer's, and Gray and Walker's motions to dismiss Count I. (Dkts. 21, 27, 48). Count I is dismissed without prejudice against Blagriff, Bachert, Dyer, Gray, and Walker. The court will **DENY** Huffman's motion to dismiss Count I. (Dkt. 46.)

Additionally, the court will **GRANT** the motions to dismiss Count II with respect to all Defendants except for Walker and Blagriff. Accordingly, the court will **GRANT** Bachert and Dyer's and Huffman's motions to dismiss. (Dkts. 27, 46.) The court will **GRANT in part**, and **DENY in part**, Gray and Walker's motion to dismiss. (Dkt. 48.) The court will **GRANT** the motion with respect to Gray and **DENY** the motion with respect to Walker. The court will also **DENY** Blagriff's motion to dismiss Count II. (Dkt. 21) Count II is dismissed without prejudice against Bachert, Dyer, Huffman, and Gray.

An appropriate Order will follow.

**ENTERED** this 7th day of May, 2025.

29

HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE